# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 23-00198-01-CR-W-SRB** |
| | ) | |
| **RICHARD NIKOLAS GALLAGHER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Pending are Defendant Richard Nikolas Gallagher's Motion to Suppress Evidence (Doc. 23) and Amended Motion to Suppress Evidence (Doc. 34). For the reasons below, it is recommended that Defendant's motions be **DENIED**.

## I.        BACKGROUND

On September 5, 2023, the grand jury returned an indictment charging Defendant with possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Doc. 1. The charge stems from methamphetamine seized by law enforcement on May 1, 2023 while executing search warrants at Defendant's residence after an assault had occurred on his property. Doc. 41 at 1. Defendant challenges the sufficiency of the initial search warrant and seeks suppression of all evidence derived from it, including evidence obtained during law enforcement's execution of subsequent search warrants. Doc. 34 at 1-14.[1]

---

[1] On November 3, 2023, Defendant filed his initial Motion to Suppress Evidence. Doc. 23. On November 22, 2023, the Government filed its opposition. Doc. 26. Defendant filed his reply on December 11, 2023. Doc. 30. On December 15, 2023, the date on which the Court scheduled an evidentiary hearing on the initial motion (Doc. 27), the parties appeared and requested the evidentiary hearing be continued because Government counsel received additional discovery, and defense counsel had not yet reviewed the discovery. Doc. 33. The evidentiary hearing was rescheduled for January 25, 2024. Docs. 33, 35. In the interim, on January 4, 2024, defense counsel filed an Amended Motion to Suppress Evidence. Doc. 34. The amended motion reiterated the same arguments as the initial motion and raised additional arguments based on the new discovery. *See* Docs. 23, 34. On January 23, 2024, the Government filed its opposition to the amended motion. Doc. 41. On January 24, 2024, Defendant filed his reply. Doc. 44. The Court has reviewed and considered all the above-referenced pleadings in making its findings and recommendations herein.

On January 25, 2024, the undersigned held an evidentiary hearing on Defendant's motions to suppress. Docs. 47, 49 (hereinafter, "Transcript" or "Tr."). Defendant was present and represented by counsel, Daniel Hunt. *Id.* The Government was represented by Assistant United States Attorney Mike Green. *Id.* At the hearing, three witnesses testified: Detective Chase Jackson, Deputy Benjamin Burch, and Deputy Nicole Collins. *Id.* In addition, thirty-nine exhibits were admitted. Doc. 48.

## II.    FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following findings of fact:

1.      On May 1, 2023, Deputy Benjamin Burch[2] responded to a dispatch call regarding a reported assault at 155 Northwest 50 Highway in Warrensburg, Missouri. Tr. at 11-12, 92-94; Gov't Ex. 1 at 2.[3] Deputy Burch arrived at the address, where both Red Tag Logistics (a business that resells trailers) and Defendant's residence are located. Tr. at 12; Gov't Ex. 1 at 1. Upon arrival at Red Tag Logistics, Deputy Burch was informed the assault victim was at a business called "B-Quip Rental," which is across the road and "fairly close" to Red Tag Logistics. Tr. at 12-13, 94; Gov't Ex. 1 at 2.

2.      When Deputy Burch arrived at B-Quip Rental, medics were attending to an individual with a laceration above his right eye and blood running down the right side of his face. Tr. at 13, 94-95; Gov't Ex. 1 at 2. The injured individual was identified as Cori Limer. Tr. at 12-13, 94-97; Gov't Ex. 1 at 2. Mr. Limer reported that Defendant[4] struck him with a metal object. Tr. at 13, 96-97; Gov't Ex. 1 at 2. He stated the incident occurred on the northwest portion of Defendant's property.

---

[2] On May 1, 2023, Burch was a sheriff's deputy with the Johnson County, Missouri Sheriff's Department. Tr. at 92-93; Gov't Ex. 1 at 2. Immediately prior to the evidentiary hearing, Burch became employed as a lieutenant for the Knob Noster, Missouri Police Department. Tr. at 92. The Court refers to Burch as "Deputy" herein as that was his position at the time of the investigation and subsequent search.

[3] A copy of Government's Exhibit 1 is also attached to Defendant's Amended Motion to Suppress. *See* Doc. 34-2.

[4] Mr. Limer, as well as other individuals, refer to Defendant as "Nick." Tr. at 96; Def. Ex. B at 02:07-03:40; Def. Ex. D at 00:31-00:38.

2

Tr. at 96-97; Gov't Ex. 1 at 2. Mr. Limer was transported to Western Missouri Medical Center. Tr. at 97; Gov't Ex. 1 at 2.

3. Deputy Burch returned to Red Tag Logistics where he met Deputies Nicole Collins[5] and Lucas Lansing. Tr. at 97-98, 109-10; Gov't Ex. 1 at 2. The officers spoke with Defendant's mother, Susan Carlyle, and a man named Dustin Keller.[6] Tr. at 109-10, 113-14; Gov't Ex. 1 at 2; Def. Ex. B at 00:01-09:22. The officers learned Defendant's residence is located down a long driveway less than one mile behind, or north of, Red Tag Logistics.[7] Tr. at 14, 37, 97-98, 110; Gov't Ex. 1 at 1; Def. Ex. B at 05:30-05:58.

4. Deputy Burch went to Defendant's residence to conduct further investigation. Tr. at 97-98, 110-11; Def. Ex. A at 0:001-01:28; Def. Ex. B at 10:34-30:20. As he approached the driveway, Defendant exited the residence. Tr. at 15, 98; Gov't Ex. 1 at 2; Def. Ex. A at 00:01-00:02. Defendant had a cut or scratch on his hand and some blood on his pants. Tr. at 99, 104, 111, 115; Def. Ex. A at 00:28-00:29.

5. Defendant informed the officers that Mr. Limer was helping him stain the outside of the residence, and they got into an argument about the color of stain being used. Tr. at 40-41, 98-99; Gov't Ex. 1 at 2; Gov't Exs. 14, 15; Def. Ex. A at 00:16-00:21; Def. Ex. B at 12:18-12:58. According to Defendant, Mr. Limer swung at him, and in response, Defendant struck Mr. Limer with his fist. Tr. at 14-16, 98-99, 112; Gov't Ex. 1 at 2; Def. Ex. A at 00:01-00:55. Deputy Burch reported Defendant denied striking Mr. Limer with a weapon. Tr. at 16, 32, 98-99; Gov't Ex. 1 at 2. Defendant

---

[5] Deputy Nicole Collins has been employed by the Johnson County, Missouri Sheriff's Office for seven years. Tr. at 108.

[6] According to Deputy Collins, Ms. Carlyle was believed to own Red Tag Logistics. Tr. at 109-10.

[7] Additionally, the officers had been informed Defendant left his residence in a black truck and headed westbound on 50 Highway. Tr. at 22; Gov't Ex. 1 at 2. Defendant's family also advised officers that Defendant was not at the residence but was in Sedalia. Def. Ex. B at 03:10-03:22. The officers spoke with Defendant on a cell phone and asked him to return to his residence. Def. Ex. B at 03:36-04:20. After a pursuit, Missouri State Highway Patrol officers located the vehicle on 50 Highway and two women were inside, but Defendant was not present in the vehicle. Tr. at 22-23; Gov't Ex. 1 at 2.

was arrested for an investigative hold related to the assault and transported to the Johnson County, Missouri Jail. Tr. at 18, 116-17; Gov't Ex. 1 at 2.

6. Deputy Burch contacted Detective Chase Jackson[8] and provided the information he learned about the assault from his interactions with Mr. Limer and Defendant. Tr. at 11-17, 71-72, 74-75, 104, 106-07. He reported no weapon was located outside of Defendant's residence. Tr. at 14, 16-17, 25. Deputy Burch advised Detective Jackson to contact Deputy Collins for more information. Tr. at 17-18. Detective Jackson instructed Deputy Burch to remain at the scene to preserve it while a search warrant was pursued. Tr. at 16-17, 85-86.

7. Detective Jackson then called Deputy Collins.[9] Tr. at 18-21, 75-76, 117-18. At the time, Deputy Collins was at the hospital interviewing Mr. Limer. Tr. at 117-18; Gov't Ex. 42 at 01:21-06:07; 10:07-12:52; Def. Ex. D at 00:18-02:29. Deputy Collins was informed by hospital staff that Mr. Limer sustained a dislocated jaw, a fractured nose, and a laceration under his right eye. Tr. at 23-24; Gov't Ex. 1 at 2. Mr. Limer told the officers at the hospital "I thought he hit me with his fist, but there is no way, it was a piece of metal right across the eye." Def. Ex. D at 01:43-01:52. Mr. Limer described being struck by a metal or hard object in subsequent conversations with the investigating officers at the hospital. Tr. at 119; Gov't Ex. 42 at 00:49-1:13, 02:57-3:13; Def. Ex. D at 01:53-01:58, 02:03-02:10, 02:35-02:42, 03:49-04:08, 08:10-08:13, 30:05-30:30.

8. Deputy Collins reported to Detective Jackson that Mr. Limer described the weapon as a pipe that was "smooth" and seemingly "black." Tr. at 76-77; Gov't Ex. 1 at 2; Gov't Ex. 42 at

---

[8] Detective Chase Jackson has twelve years of law enforcement experience. Tr. at 9. He served as a law enforcement officer with the Henry County, Missouri Sheriff's Office for four years. Tr. at 9. He also served as a patrolman and a criminal investigator with the Warrensburg, Missouri Police Department for five years. Tr. at 9. While working at the Warrensburg Police Department, Detective Jackson was also cross-commissioned as a task force officer and served three years with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Tr. at 9. For the past three years, Detective Jackson has been a criminal investigator with the Johnson County, Missouri Sheriff's Office. Tr. at 8. As a criminal investigator, he investigates violent crimes, illegal narcotics, burglaries, and various other crimes. Tr. at 10.

[9] Deputy Collins's side of this conversation was recorded by her body camera. Tr. at 18-23; Gov't Ex. 42.

01:25-03:37.   Deputy Collins also told Detective Jackson that Mr. Limer put "his middle finger and his thumb together" and described the pipe as "smaller than the hole that his middle finger and thumb make when he puts them together."   Tr. at 76-77; Gov't Ex. 42 at 02:20-02:30.   Further, Deputy Collins notified Detective Jackson that Mr. Limer appeared to be high and "kind of all over the place." Tr. at 79; Gov't Ex. 42 at 01:57-02:02.

9.      Detective Jackson contacted Robert Russell, the prosecuting attorney for Johnson County, and briefed him on the information provided to him by Deputies Burch and Collins.  Tr. at 25-26.  Detective Jackson told Mr. Russell he wanted to apply for a search warrant to find the weapon and other evidence of the crime.  Tr. at 26.  Based on the information provided to him, Mr. Russell opined there was sufficient probable cause and requested an affidavit from Detective Jackson.  Tr. at 26.

10.      Detective Jackson prepared the first Affidavit/Application for Search Warrant (hereinafter, "affidavit").  Tr. at 24, 26, 77-79, 81-82, 133-34; Gov't Ex. 1.  He sought a warrant to search the interior and exterior of Defendant's residence for the weapon used by Defendant when he assaulted Mr. Limer and for trace evidence, including blood, from the assault.  Tr. at 17, 24-25; Gov't Ex. 1 at 1-2.  He believed evidence of the assault could be inside Defendant's residence because the assault occurred outside the residence, and Defendant "exited the residence when law enforcement came to the house."  Tr. at 24-25.  Further, Detective Jackson thought blood could have transferred onto Defendant or his clothing during the assault, and he might have cleaned himself inside his residence.  Tr. at 25.  As an investigator, Detective Jackson wanted to recover any blood or other trace evidence from the assault.  Tr. at 25.

11.      The affidavit requested a warrant to search "[t]he residence at 155 NW 50 Highway, Warrensburg, Johnson County, Missouri, including the area outside the residence and the woods

surrounding the residence on the property." Tr. at 28-29; Gov't Ex. 1 at 1.[10] The affidavit described the residence as "a single-story home with brown wood siding and a maroon metal roof" and "[t]he main pedestrian entrance faces southeast." Tr. at 28-29; Gov't Ex. 1 at 1. "The residence is approximately [three-fourths] of a mile north of the Red Tag Logistics business that sits on the north side of 50 highway. The driveway to the residence sits on the east side of the business, and shares a drive that connects to 50 highway."[11] Tr. at 27-30; Gov't Ex 1 at 1.

12.     The affidavit requested search and seizure of "evidence of the crime to include but not limited to, blood, tissue, fibers and the black smooth cylindrical object approximately 1 to 2 inches in diameter which extended from Richard Nickolas Gallagher's hand and was used to strike Cory Limer." Tr. at 29-30; Gov't Ex. 1 at 1. When Detective Jackson prepared the affidavit, he had not yet reviewed any videos from body cameras worn by Deputy Burch, Deputy Collins, and Deputy Lansing. Tr. at 30-31, 130-32; Gov't Ex. 42; Def. Exs. A, B, D. According to Detective Jackson, Mr. Russell reviewed the affidavit, including the description of the weapon and the request to search for blood, tissue and fibers. Tr. at 29-30, 34, 81. The requested search warrant was issued by the Honorable Brent Teichman, Associate Circuit Court for Johnson County, Missouri.[12] Tr. at 34-36, 83-84; Gov't Ex. 2.[13]

13.     During execution of the search warrant, law enforcement officers found a black prybar on a coffee table outside the residence, cameras mounted around the residence's exterior, shards of a

<hr />

[10] The affidavit referenced the address of 155 NW 50 Highway, Warrensburg, Johnson County, Missouri in three separate provisions. Govt. Ex.1 at 1-2.

[11] In both the affidavit and the initial search warrant, another address was listed as the requested residence to be searched. Gov't Ex. 1 at 2; Gov't Ex. 2 at 1. The second address – 109 W. Culton St., Apt. B, Warrensburg, Missouri – was a typographical error and appeared in the last of the three references to 155 NW 50 Highway, Warrensburg, Johnson Count, Missouri in the affidavit. Tr. at 32-33, 35, 82-85; Gov't Ex. 1 at 2; Gov't Ex. 2 at 1. According to Detective Jackson, he used a prior search warrant and failed to delete the reference to the Culton Street location. Tr. at 33. The search warrant contained the same typographical error. Tr. at 35-36; Gov't Ex. 2.

[12] Associate Circuit Judge Teichman issued all search warrants related to Defendant's residence. Tr. at 28, 33-35, 54, 58, 60, 66, 83-84; Gov't Exs. 2, 4, 6, 8, 10.

[13] A portion of Government's Exhibit 2 is also attached to Defendant's Amended Motion to Suppress. *See* Doc. 24-1.

crystalline substance on top of a dresser,[14] drug paraphernalia, and a Nightwatch Security Openeye DVR security system (hereinafter, "surveillance system") sitting on top of a Sanctuary Platinum safe (hereinafter, "safe").[15]  Tr. at 41-52, 87-88; Gov't Ex. 3 at 2; Gov't Ex. 5 at 2-3; Gov't Ex. 7 at 2; Gov't Exs. 17-26, 30-32.  According to Detective Jackson, he did not believe the prybar to be the assault weapon because "[Mr.] Limer describe[ed] a smooth cylindrical metal object," "[the prybar] was not cylindrical," and the prybar did not have blood on it.  Tr. at 41-42.  The prybar was only seized out of caution.  Tr. at 42.

14.     On the same day, Detective Jackson requested three additional warrants for (1) search and seizure of all controlled substances, weapons, and any evidence associated with the purchase, manufacture, sale, or distribution of drugs; (2) entry into the safe to search and seize any controlled substances, weapons, and any other evidence associated with the purchase, manufacture, sale, or distribution of drugs located therein; and (3) search and seizure of the surveillance system.[16]  Tr. at 53-66; Gov't Exs. 3, 5, 7.  The requests were granted, and search warrants were issued.  Tr. at 53-61, 65-66; Gov't Exs. 4, 6, 8.

15.     While executing an additional search warrant at the residence, law enforcement located and seized more than one kilogram of methamphetamine from a bathroom.  Tr. at 61-63; Gov't Ex. 4 at 6; Gov't Exs. 27-29.  As a result, Defendant Gallagher was indicted in this matter.  Doc. 1; Doc. 41 at 1.

---

[14] A preliminary TruNarc test identified the crystalline substance as methamphetamine.  Tr. at 44-46; Gov't Exs. 18-20.

[15] The dresser was in a bedroom believed to be Defendant's based on his Costco membership card and pictures of him located therein.  Tr. at 44-46.  The surveillance system and the safe were in the closet attached to this bedroom.  Tr. at 47-48.

[16] On May 4, 2023, Detective Jackson requested another warrant for user account information associated with the surveillance system.  Tr. at 64-66; Gov't Ex. 9.  The request was granted, and a search warrant was issued.  Tr. at 66; Gov't Ex. 10.

Case 4:23-cr-00198-SRB     Document 51     Filed 03/28/24     Page 7 of 23

## III.    DISCUSSION

Defendant seeks suppression of all evidence derived from the search of his residence.  Docs. 23, 34.  He raises the following arguments: (1) there was no probable cause to support issuance of the warrant; (2) there was no probable cause to support a search of the residence's interior; (3) Detective Jackson violated *Franks* by making false implications therein and intentionally omitting information from his affidavit requesting the initial search warrant; (4) the search warrant did not describe with particularity the property to be seized; (5) the good faith exception does not apply to execution of the initial search warrant; and (6) all evidence resulting from the execution of subsequent search warrants should be suppressed as fruit of the poisonous tree.  Doc. 23 at 3-10; Doc. 34 at 3-14.

The Government opposes Defendant's motions.  Docs. 26, 41.  It argues probable cause existed for issuance of the initial search warrant and for the interior search of Defendant's residence, and the warrant described with particularity the property to be seized.  Doc. 26 at 6-15.  The Government also contends Defendant is not entitled to a *Franks* hearing, the good faith exception applies, and evidence obtained from subsequent warrants should not be suppressed.  Doc. 26 at 11-19; Doc. 41 at 1-6.

### A.    Probable Cause

The Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  "Probable cause exists when the totality of circumstances [indicates] 'a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *United States v. Ivey*, 91 F.4th 915, 917 (8th Cir. 2024) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The Court's role in reviewing another judge's probable cause determination is "to ensure that the issuing judge 'had a substantial basis for concluding that probable cause existed.'"  *United States*

8

*v. Juneau*, 73 F.4th 607, 614 (8th Cir. 2023) (quoting *United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017)). "Probable cause is not a high bar," and a reviewing court must pay "great deference" to an issuing judge's probable cause determination. *Id*. (citations omitted). When an issuing judge relies solely on an affidavit in reaching a probable cause determination, the reviewing court's consideration is limited to the information "found within the four corners of the affidavit." *Id*. (citing *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003)).

**(1)    Address of Defendant's Residence**

Defendant avers there was no probable cause for issuance of the initial search warrant because the affidavit "failed to set forth sufficient facts about the location of the assault." Doc. 23 at 3-4; Doc. 34 at 4. He alleges "the affidavit only stated that the assault occurred at Mr. Gallagher's residence," but "nothing in the affidavit established where Mr. Gallagher resided." *Id*. Further, Defendant points out the affidavit references two different addresses without specifying which one was Gallagher's residence. *Id*. The Government argues the affidavit provided sufficient facts to establish 155 NW 50 Highway as Defendant's residence. Doc. 26 at 9-10.

The place to be searched must be described in a search warrant "with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort" with "no reasonable probability that another premise[s] might be mistakenly searched." *United States v. Johnson*, 75 F.4th 833, 843-44 (8th Cir. 2023) (quoting *United States v. Thurman*, 625 F.3d 1053, 1057 (8th Cir. 2010)). "Mere technical errors . . . are not enough to invalidate a search warrant." *United States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993). In fact, "an incorrect street address of the place to be searched is not necessarily fatal to a warrant's validity." *Johnson*, 75 F.4th at 844 (internal citations omitted) (holding a search of a residence was lawful, despite the affidavit and warrant incorrectly identifying the address, because the residence's description was sufficiently particular, and the officers had personal knowledge of the residence to be searched); *see also United*

9

*States v. Gitcho*, 601 F.2d 369, 371-72 (8th Cir. 1979) (upholding a search warrant with an erroneous address because the agents executing the warrant personally knew of the intended premises to be searched and the premises was under constant surveillance while the search warrant was being obtained).

The affidavit in this case clearly indicated the alleged assault occurred at Defendant's property and that Deputy Burch observed Defendant exit the residence when he was investigating the location of the reported assault. Gov't Ex. 1 at 2. Detective Jackson's affidavit also identified "the residence at 155 NW 50 Highway, Warrensburg, Johnson County, Missouri" as the place to be searched.[17] Gov't Ex. 1 at 1. This address is listed in bold typeface twice on the first page of the affidavit and once on the second page. *Id*. Detective Jackson provided a detailed description of Defendant's residence in three separate provisions of the affidavit:

> The residence is a single-story home with brown wood siding and a maroon metal roof. The main pedestrian entrance faces southeast. The residence is approximately 3/4 of a mile north of the Red Tag Logistics business that sits on the north side of 50 highway. The driveway to the residence sits on the east side of the business, and shares a drive that connects to 50 highway.

*Id*. at 1-2 (emphasis deleted). His description accurately depicts Defendant's residence. *Compare id*. with Gov't Exs. 11-13.

On the second page of Detective Jackson's affidavit, he mistakenly included another address – 109 W. Culton Street Apt B, in Warrensburg, Johnson County, Missouri, in a conclusory paragraph. *Id*. at 2. But the Culton address is immediately followed by the correct address for Defendant's residence. *See id*. The issued search warrant twice identifies the residence with the correct address. Gov't Ex. 2 at 1. While the search warrant, similar to the affidavit, includes a reference to the

---

[17] Further, the affidavit provides multiple references to Highway 50. It recounts Mr. Limer's report that the assault occurred at Defendant's residence, and afterwards, he saw Defendant's vehicle "leave westbound on highway 50." Gov't Ex. 1 at 2. The affidavit also indicates Mr. Limer headed "westbound on 50 highway" after the incident. *Id*. Lastly, the affidavit specifies Defendant's vehicle was later located "on 50 highway near the incident location." *Id*.

incorrect address, the mistaken reference is immediately followed by Detective Jackson's accurate listing of the address and the detailed description of the residence. *Id*. In addition, Deputy Burch spoke with Defendant at his residence and Detective Jackson told him to stay there and preserve the scene while Detective Jackson obtained a search warrant. Tr. at 16-17, 73-74, 85-86. Thus, Deputy Burch had personal knowledge that the residence to be searched was located at 155 NW 50 Highway.

Considering the totality of the circumstances and paying great deference to the issuing judge's probable cause determination, the undersigned finds the search warrant described with sufficient particularity the residence to be searched. The Court also concludes there was no reasonable probability that another residence might be mistakenly searched. The inclusion of the reference to the Culton address was a typographical error. As such, the undersigned recommends the Court find the inclusion of the incorrect address is a mere technical error that does not invalidate the initial search warrant and the subsequent search executed at 155 NW 50 Highway.

**(2)      Interior Search of Defendant's Residence**

Defendant asserts there was no probable cause to issue a warrant to search his residence's interior. Doc. 23 at 4-5; Doc. 34 at 4-5. He contends nothing in the affidavit suggests "blood, tissue, fibers [or] the black smooth cylindrical object" would be located inside his residence because the assault took place outside the residence. Doc. 23 at 5; Doc. 34 at 4-5. The Government argues sufficient probable cause existed to search Defendant's residence for trace evidence (i.e., "blood, tissue, and fibers") and the assault weapon. Doc. 26 at 10-11.

A request for a search warrant must provide "evidence of a nexus between the contraband and the place to be searched." *Johnson*, 848 F.3d at 878 (citations omitted); *see also United States v. Perry*, 531 F.3d 665-66 (8th Cir. 2008) (holding a sufficient nexus existed for a warrant to search the interior of a residence for a murder weapon based in part on participants and witnesses spending time at the residence shortly before and after the homicide occurred).

11

"Factors to consider in determining if a nexus exists include the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *Johnson*, 848 F.3d at 878 (citation omitted). For example, the District Court of Minnesota found a sufficient nexus between the interior of a defendant's residence and possible assault trace evidence in *United States v. Warren* because evidence suggested the defendant was involved in the assault, the victim was bleeding, and law enforcement located Defendant inside the subject residence after the assault with possible blood stains on his shorts. No. 20-CR-143 (NEB/LIB), 2020 WL 9171088 at *16-17 (D. Minn. Dec. 21, 2020), report and recommendation adopted, No. 20-CR-143 (NEB/LIB), 2021 WL 778169 (D. Minn. Mar. 1, 2021).

### (a) Trace Evidence

Here, the affidavit provides information about an assault occurring at Defendant's residence, including the victim's statement that the assault "took place [on the] northwest portion of the property." Gov't Ex. 1 at 2. Detective Jackson's affidavit further represents Deputy Burch met with Mr. Limer and "observed a large laceration over his right eye" as well as "blood on the right side of his face down his cheek to his chin." *Id*. He also averred Deputy Burch "observed Gallagher exit the residence" shortly after the assault occurred. *Id*.

Based on the foregoing, the undersigned finds it is reasonable and logical to infer blood, fiber, and/or tissue could have been generated from the assault that occurred on the northwest portion of the property and deposited on the alleged assault weapon, on Defendant's person and/or on Defendant's clothing. The undersigned also concludes it is reasonable and logical to infer that trace evidence could have been deposited or transferred on clothing or other items located inside Defendant's residence, particularly since Defendant entered the residence after the assault and exited the residence when law enforcement arrived a short time later. For these reasons, the undersigned recommends the

12

Court find the affidavit provides a sufficient nexus between potential trace evidence and the interior of Defendant's residence.

**(b)  Weapon**

Defendant contends law enforcement did not need to search for a weapon inside his residence because they located an item, in plain view, outside of the residence and "ultimately believed [it] to be the weapon referenced in the affidavit." Doc. 23 at 4-5; Doc. 34 at 4-5. While law enforcement found a black prybar located on a coffee table outside of the residence, they did not believe it to be the assault weapon, and the item was only seized out of caution. Tr. at 42. Detective Jackson did not believe the prybar was the assault weapon because "[Mr.] Limer describe[ed] a smooth cylindrical metal object," and "[the prybar] was not cylindrical." *Id*. He also thought the assault weapon could have blood on it, and the prybar did not contain any blood. *Id*.

The assault, according to the victim, occurred outside. And law enforcement saw Defendant exit his residence shortly after the assault when they arrived to investigate. Accordingly, the undersigned recommends the Court find the affidavit provides a sufficient nexus between the alleged weapon and the interior of Defendant's residence. Based on the foregoing, the undersigned finds it is reasonable and logical to infer Defendant may have taken the assault weapon inside his residence after the assault.

**B.  Alleged *Franks* Violation**

*Franks v. Delaware* provides the legal framework for the Court's analysis. Pursuant to *Franks*, an affidavit supporting a search warrant is presumed valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *see also United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022). An affidavit that includes deliberately false allegations, recklessly disregards the truth, or intentionally or recklessly omits key facts may violate the Fourth Amendment. *Franks*, 438 U.S. at 155-56; *Hartman v. Bowles*, 39 F.4th 544, 546 (8th Cir. 2022) (citation omitted). A probable cause affidavit

13

accompanying a search warrant may be challenged if it "contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (citing *Franks*, 438 U.S. at 155-56). Before addressing whether a *Franks* violation occurred, the Court must first determine whether Defendant is entitled to an evidentiary hearing.

### (1)    Entitlement to a Franks Hearing

A defendant is entitled to a *Franks* hearing when he or she makes "a substantial preliminary showing that there was an intentional or reckless false statement or omission which was necessary to the finding of probable cause." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008); *see also Franks*, 438 U.S. at 155-56; *United States v. Daigle*, 947 F.3d 1076, 1083 (8th Cir. 2020). The substantial preliminary showing required for a *Franks* hearing "is not lightly met." *Arnold*, 725 F.3d at 898 (citation omitted). An attack on an affidavit "must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171. A defendant must assert the affidavit contained a deliberate falsehood, or the affiant recklessly disregarded the truth. *Id*. "Allegations of negligence or innocent mistake are insufficient." *Id*.

To meet the substantial preliminary showing, a defendant must provide "specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) (citation omitted); *see also United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021). When the defendant offers no proof "an affiant deliberately lied or recklessly disregarded the truth, a *Franks* hearing is not required." *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) (citation omitted); *see also United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (citation omitted).

Defendant avers he is entitled to a *Franks* hearing because Detective Jackson's affidavit failed to clearly state the assault took place outside Defendant's residence, and the affidavit omitted uncertainties surrounding the weapon, if any, used to assault Mr. Limer. Doc. 23 at 5-6; Doc. 34 at

14

5-10. The Government asserts Defendant is not entitled to a *Franks* hearing because he failed to make the substantial preliminary showing required to receive one. Doc. 26 at 13; Doc. 41 at 4.

### (a) Location of the Assault

Defendant contends the affidavit failed to specify the assault occurred outside the residence and falsely implies the assault occurred inside the residence. Doc. 23 at 5-6; Doc. 34 at 5-6. The Government asserts the affidavit sufficiently indicates the assault occurred outside Defendant's residence, and as such, Defendant fails to make a substantial preliminary showing that the affidavit contained an intentionally or recklessly false implication. Doc. 26 at 12-14.

Nothing in the affidavit suggests Detective Jackson falsely represented – much less, intentionally or recklessly represented – the assault occurred inside Defendant's residence. Rather, the affidavit specifies the assault "took place [on] the northwest portion of the property." Gov't Ex. 1 at 2. Additionally, the affidavit states Defendant reported the assault occurred while he and Mr. Limer were staining his residence after "an argument ensued regarding the color of stain being used on the property." *Id.* While the affidavit does not expressly state the assault occurred inside or outside Defendant's residence, the facts contained therein reasonably suggest the assault occurred outside the residence. The affidavit describes the place to be searched as the residence "including the area outside the residence and the woods surrounding the residence on the property." Gov't Ex. 1 at 1. Aside from Detective Jackson's affidavit, Defendant offers no additional proof to support his contention that the detective made false or reckless representations to mislead the issuing judge. The affidavit does not intentionally or recklessly misrepresent the location of the assault.

### (b) Omission of Uncertainty about the Assault Weapon

A defendant seeking a *Franks* hearing based on omission of information must make a substantial preliminary showing that "(1) the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead,

15

and (2) the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Riaski*, 91 F.4th 933, 936 (8th Cir. 2024) (quoting *United States v. Gater*, 868 F.3d 657, 659-60 (8th Cir. 2017)). Defendant argues he is entitled to a *Franks* hearing because the affidavit does not indicate uncertainty surrounding the assault weapon in an effort to mislead the issuing judge. Doc. 23 at 5-6; Doc. 34 at 6-10.

In support, Defendant references a conversation captured on body cameras between Deputies Burch and Collins where they questioned whether the injuries could have been caused by a fist (as opposed to a weapon) and where Deputy Burch indicated Defendant had marks on his fist suggesting he possibly struck the victim with his hand. Doc. 34 at 7; *see also* Def. Ex. A at 04:38-05:33, 06:10-06:30. Defendant also relies on an initial conversation between the deputies and the victim at the hospital where the victim stated he thought Defendant hit him with his fist at first.[18] Doc. 34 at 6-8. Defendant also cites to a handwritten statement prepared by the victim at the hospital wherein he states Defendant struck him in the eye, but he did not specify that he was struck with a metal object. Doc. 34 at 8; Tr. at 125-26; Def.'s Ex. E.

The evidence demonstrates Deputy Burch reported to Deputy Jackson that Mr. Limer stated he was assaulted with a metal object. Tr. at 171. Deputy Collins also told Detective Jackson that Mr. Limer reported being struck with a metal object. Tr. at 76; *see also* Gov't Ex. 1 at 2; Gov. Ex. 42 at 01:25-03:37. Deputy Collins further advised Detective Jackson that Mr. Limer put "his middle finger and his thumb together" and described the pipe as being "smaller than the hole that his middle finger and thumb make when [he] put them together." Gov't Ex. 42 at 02:20-02:30. According to Deptuy

---

[18] Tellingly, after stating he initially thought he was struck with a fist, the victim immediately stated, "but there is no way, it was a piece of metal right across the eye." Def. Ex. D at 01:43-01:52. Mr. Limer described being struck by a metal or hard object in subsequent conversations with the investigating officers at the hospital. Tr. at 119; Gov't Ex. 42 at 00:49-1:13, 02:57-3:13; Def. Ex. D at 01:53-01:58, 02:03-02:10, 02:35-02:42, 03:49-04:08, 08:10-08:13, 30:05-30:30.

Collins, Mr. Limer was always clear that he had been struck with a metal object, even though he was not always clear on its description. Tr. at 119.

Based on the information provided by Deputies Burch and Collins, Detective Jackson stated in his affidavit: "victim stated he was struck by a smooth black cylindrical object which he showed was about 1 to 2 inches in diameter [. . .]." Gov't Ex. 1 at 2. The affidavit also referenced Defendant's statement to Deputy Burch that Defendant acted "in self-defense [and] struck [Mr. Limer] with a balled fist." *Id*. The affidavit thus contained both the Defendant's and the victim's version of the alleged assault.

Detective Jackson's affidavit primarily relied on information provided by Deputy Collins and Deputy Burch. When he executed the affidavit, Detective Jackson had not reviewed any of the body camera footage, nor the Defendant's handwritten statement. Tr. at 130-31. Thus, he was not aware of the conversation between Deputies Burch and Collins where they discussed whether the injury could have resulted from a fist or a metal object. He was not aware of the victim's statement that he initially thought he was hit with a fist before determining he was struck with a metal object. And he was not aware of the contents of the victim's handwritten statement. "An officer who does not personally know information cannot intentionally or recklessly omit it." *Riaski*, 91 F.4th at 936 (citing *Hartman*, 39 F.4th at 546); *see also United States v. Bausby*, 720 F.3d 652, 657-58 (8th Cir. 2013) (holding the omission of information not known to the officer did not give rise to a *Franks* violation).

Defendant presented no evidence that Detective Jackson intentionally, or recklessly, omitted facts to mislead the issuing judge. All evidence provided suggests Detective Jackson prepared the affidavit accurately and in accordance with the information provided to him by the responding officers. The omitted information was simply not known to Detective Jackson.

Even if Defendant had satisfied the substantial preliminary showing, he did not demonstrate the affidavit, if supplemented by the allegedly omitted information, could not support a finding of probable cause. The affidavit states Mr. Limer had "a large laceration over his right eye" with "blood on the right side of his face down his cheek" and reports Mr. Limer's statement that he believed he was struck with "a black, smooth cylindrical object." Gov't Ex. 1 at 2. The affidavit further specified Deputy Collins was informed by hospital staff that the "victim sustained a dislocated jaw, fractured nose, and a laceration under his right eye." *Id*. Even if the affidavit contained the omitted information about uncertainty surrounding the description of the alleged assault weapon, the serious nature of Limer's injuries and his reported belief that he was assaulted with a metal object would provide sufficient probable cause for officers to search for a weapon and for any trace evidence that was generated from observed injuries to Mr. Limer.

The undersigned finds Defendant Gallagher has failed to make a substantial preliminary showing that Detective Jackson intentionally or recklessly made false suggestions, misled the issuing judge, or omitted information from the affidavit. Accordingly, the undersigned recommends the Court find Defendant is not entitled to a *Franks* hearing.

**(2)** ***Franks* Violation**

Even if the Court were to find Defendant satisfied the substantial preliminary showing for a *Franks* hearing, the undersigned recommends the Court conclude no *Franks* violation occurred. To establish a *Franks* violation, a defendant must prove by a preponderance of the evidence (1) the affiant knowingly and intentionally (or with reckless disregard for the truth) included a false statement necessary to the probable cause finding, or omitted facts with the intent to make (or in reckless disregard of whether the omitted facts rendered) the affidavit misleading; and (2) the affidavit, if the false statement is excised or the omitted information is supplemented, could not support a probable cause finding. *Franks*, 438 U.S. at 171-72; *Hartman*, 39 F.4th at 546 (citation omitted); *United States*

18

*v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (citation omitted); *United States v. Butler*, 594 F.3d 955, 960-61 (8th Cir. 2010) (citation omitted).

During the evidentiary hearing, Defendant offered no additional proof to support his contention that Detective Jackson knowingly and intentionally included false statements in the affidavit necessary to a probable cause finding nor omitted facts with the intent to make the affidavit misleading. Rather, evidence adduced at the evidentiary hearing confirmed Detective Jackson accurately reported information provided by other officers. Furthermore, for the same reasons discussed *supra*, section III(B)(1)(b), even if the affidavit was supplemented by the allegedly omitted information, there would still be sufficient probable cause to support a search for an assault weapon and trace evidence generated from the assault. Accordingly, the undersigned recommends the Court conclude no *Franks* violation occurred.

## C. Particularity

Defendant contends the warrant did not sufficiently describe the "blood, tissue, [and] fibers" to be searched and seized. Doc. 23 at 6-8; Doc. 34 at 11-12. He contends the warrant "does not state whose blood officers were tasked to search for" and does not describe "what was meant by tissue and fibers" nor where the officers might find the items, and therefore, the warrant was impermissibly overbroad. *Id*. The Government contends the warrant sufficiently described the items to be seized. Doc. 26 at 14-15.

The Fourth Amendment's particularity requirement prevents law enforcement "from conducting general, exploratory rummaging of a person's belongings." *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir. 2023) (citation omitted). A warrant must be sufficiently definite to enable officers to identify the place to be searched and the property to be seized. *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007); *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988). When determining particularity, courts consider several factors including "the purpose for

19

which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (citation omitted). The particularity requirement is "one of practical accuracy rather than hypertechnicality." *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014) (citation omitted). The degree of required specificity "is flexible and may vary depending on the circumstances and the types of items involved." *Frederickson*, 846 F.2d at 519 (citation omitted).

Here, the search warrant described the place to be searched as follows:

> The residence at 155 NW 50 Highway, Warrensburg, Johnson County, Missouri, including the area outside the residence and the woods surrounding the residence on the property. The residence is a single-story home with brown wood siding and a maroon metal roof. The main pedestrian entrance faces southeast. The residence is approximately [three-fourths] of a mile north of the Red Tag Logistics business that sits on the north side of 50 highway [sic]. The driveway to the residence sits on the east side of the business, and shares a drive that connects to 50 highway.

Gov't Ex. 2 at 1 (emphasis deleted). The warrant described the items to be seized as "evidence of the crime to include but not limited to, blood, tissue, fibers and the black smooth cylindrical object approximately 1 to 2 inches in diameter which extended from Richard Nickolas Gallagher's hand and was used to strike Cory Limer." *Id*. Further, the supporting affidavit described Defendant's assault of Mr. Limer, stated Defendant admitted to hitting Mr. Limer with his fist, described Mr. Limer's injuries, and explained Defendant exited his residence to speak with officers shortly after the assault. Gov't Ex. 1 at 2.

The warrant instructed officers to search the residence and the surrounding property and seize anything that appeared to have blood, fiber, or tissue relevant to the assault. The affidavit identified Defendant's admitted assault of Mr. Limer and provided sufficient factual background as to why blood, fiber, or tissues might have been generated from the assault. This description is sufficiently particular. *See United States v. Thunder*, Case No. CR. 11-30113-RAL, 2012 WL 5844809 at *8 (D.S.D. Oct. 12, 2012) (holding a search warrant describing items to be seized as blood, DNA, and

textile fiber evidence in a sexual assault investigation was sufficiently particular). Applying these standards, the Court finds no merit to Defendant's assertion that the search warrant terms were insufficiently particular. Based on the foregoing analysis, the undersigned recommends the Court find the warrant sufficiently particularized the items – including blood, fiber, or tissue – to be searched and seized.

### D. Good Faith Exception

If the Court were to conclude the search warrant lacked probable cause, the Government maintains law enforcement was entitled to rely in good faith on the warrant. Doc. 26 at 15-18. When evidence is seized in violation of the Fourth Amendment, it may be suppressed under the exclusionary rule. *United States v. Eggerson*, 999 F.3d 1121, 1124 (8th Cir. 2021) (citing *United States v. Leon*, 468 U.S. 897, 906 (1984)). However, when a search warrant is defective or invalid, the good faith exception to the exclusionary rule may apply. *Id.* (citing *Leon*, 468 U.S. at 925).

"The Supreme Court has held the exclusionary rule should not be applied to bar the admission of 'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate.'" *United States v. Ralston*, 88 F.4th 776, 779 (8th Cir. 2023) (quoting *Leon*, 468 at 900, 922-23). The good faith exception establishes "that if an officer (1) obtains a search warrant (2) that appears properly issued on its face and (3) executes it within its scope and with objective good faith reliance on the warrant's validity, then a defect in the probable cause analysis undergirding that warrant will not cause evidence to be suppressed." *Eggerson*, 999 F.3d at 1124 (citing *Leon*, 468 U.S. at 922).

There are four factors to consider in assessing whether an officer acted in good faith: (1) whether the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) whether the issuing judge wholly abandoned her judicial role in issuing the warrant; (3) whether the affidavit

supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) whether the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid. *United States v. Dickerman*, 954 F.3d 1060, 1065 (8th Cir. 2020) (citation omitted). In assessing whether an officer relied in good faith on the validity of a warrant, a reviewing court considers the totality of the circumstances which includes any information known to the officer that was not included in the affidavit. *Ralston*, 88 F.4th at 779.

No evidence suggests any factor exists here. As analyzed *supra*, Section III(B), the affidavit did not contain any knowing or reckless false statements or omissions. There is no evidence in this record that the issuing judge in any way abandoned his role in issuing the warrants in question. As analyzed *supra*, Section III(A), there was sufficient probable cause for issuance of the search warrants. And there was no facial deficiency in the warrants in question. The four factors all suggest the officers relied in good faith on the warrants issued in this case. For the same reasons discussed *supra*, sections III(A), (B), and (C), Defendant's arguments fail. However, should the Court find the search warrant lacked probable cause, the undersigned recommends Defendant's motions to suppress be denied because the good faith exception applies.

**E.     Fruit of the Poisonous Tree**

Finally, Defendant contends the subsequent search warrants and all evidence obtained therefrom should be suppressed as fruit of the poisonous tree. Doc. 23 at 9-10; Doc. 34 at 13-14. Because the undersigned recommends suppression is not required, the evidence seized from execution of the initial search warrant and from subsequently obtained search warrants need not be suppressed under the exclusionary rule. *See United States v. Betts*, 88 F.4th 769, 773 (8th Cir. 2023) (citation omitted) (holding the exclusionary rule "extends to evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'") (citation omitted).

## IV.    CONCLUSION

Based on the foregoing, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's initial Motion to Suppress Evidence (Doc. 23) and denying Defendant's Amended Motion to Suppress Evidence (Doc. 34).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

**IT IS SO ORDERED.**

DATE: March 28, 2024                    ___*/s/ W. Brian Gaddy*_____
                                                      W. BRIAN GADDY
                                                      UNITED STATES MAGISTRATE JUDGE